```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ROSETTA WATSON,                    :

                 Plaintiff,        :    09 Civ. 6624 (HBP)

     -against-                     :

TIMOTHY F. GEITHNER, Secretary,    :
Department of the Treasury,
                                   :
                 Defendant.        :
                                   :
----------------------------------X

ROSETTA WATSON,                    :

                 Plaintiff,        :    10 Civ. 3948 (HBP)

     -against-                     :

TIMOTHY F. GEITHNER, Secretary,    :
Department of the Treasury,
                                   :
                 Defendant.        :
                                   :
----------------------------------X

ROSETTA WATSON,                    :

                 Plaintiff,        :    10 Civ. 7282 (HBP)

     -against-                     :
                                        OPINION
TIMOTHY F. GEITHNER, Secretary,    :    & ORDER
Department of the Treasury,
                                   :
                 Defendant.        :
                                   :
----------------------------------X
```

PITMAN, United States Magistrate Judge:

I.   <u>Introduction</u>

In these three actions, plaintiff alleges that she was discriminated against on the basis of her race, gender, age and disability.  She also alleges that she has been the victim of illegal retaliation and subjected to a number of adverse employment actions as a result of the discrimination, including disparate treatment and harassment.  Defendant moves for an Order granting him summary judgment pursuant to Fed.R.Civ.P. 56 on the grounds that (1) there is no evidence to establish certain of the elements of a <u>prima facie</u> case of discrimination or retaliation, and (2) defendant had legitimate, non-discriminatory and non-retaliatory reasons for the putatively adverse employment actions (Docket Item 41[1]).  Defendant also moves for an Order dismissing the complaint pursuant to 28 U.S.C. § 1915(e)(2)(A) on the ground that plaintiff has falsely claimed poverty in order to be granted leave to proceed <u>in forma pauperis</u> (Docket Item 56).

The parties have consented to my exercising plenary jurisdiction over the consolidated actions pursuant to 28 U.S.C. ¶ 636(c).  For the reasons set forth below, defendant's motion for summary judgment dismissing plaintiff's complaints is granted

---

[1]Unless otherwise stated, all Docket Items cited herein refer to the lead case, 09 Civ. 6624.

on the grounds that:  (1) there is no evidence to establish at least one element of a prima facie case of either discrimination or retaliation and (2) plaintiff has failed to rebut the legitimate, non-retaliatory and non-discriminatory reasons proffered by defendant for the allegedly adverse employment actions.

## II.  Facts[2]

### A.  Background

Plaintiff is an African-American woman, 65 years of age, who has worked for the Internal Revenue Service ("IRS") since February 1988 (Transcript of Deposition of Rosetta Watson, conducted on July 7 and July 14, 2011 ("Consol. Actions Dep."), at 24-25, 45, annexed as Exhibit A to the Declaration of AUSA Bertrand Madsen, dated June 1, 2012 (Docket Item 45)).  At the time of the events in issue, plaintiff worked as a secretary at the IRS's Wage and Investment Operating Division in Manhattan; among other things, she typed, prepared materials for mailings, answered the telephone and filed taxpayer forms (see Consol. Actions Dep. at 30-31, 51-52, 463-64).

---

[2]Because I find it unnecessary to address defendant's contention that plaintiff misrepresented her financial status in order to be granted leave to proceed in forma pauperis, I omit all facts concerning that argument.

During her tenure with the IRS, plaintiff has filed approximately twenty-one complaints with the agency's Equal Employment Opportunity ("EEO") office and has commenced five discrimination actions against the IRS in this Court (Watson v. Paulson, 04 Civ. 5909 (VM)(HBP) ("Watson I"); Watson v. Geithner, 09 Civ. 6624 (HBP) ("Watson II"); Watson v. Geithner, 10 Civ. 3948 (HBP) ("Watson III"); Watson v. Geithner, 10 Civ. 7282 (HBP) ("Watson IV"); Watson v. Geithner, 11 Civ. 9527 (AJN)(HBP) ("Watson V")).  The Honorable Victor Marrero, United States District Judge, granted the IRS's motion for summary judgment and dismissed the complaint in Watson I.  Watson v. Paulson, 578 F. Supp. 2d 554 (S.D.N.Y. 2008), aff'd, 355 F. App'x 482 (2d Cir. 2009).  On August 8, 2013, I issued a Report and Recommendation to the Honorable Alison J. Nathan, United States District Judge, recommending that defendant's motion for summary judgment be granted and that the complaint in Watson V be dismissed (Docket Item 28 in 11 Civ. 9527).[3]  Watson II, Watson III and Watson IV have been consolidated and are the subjects of the motion considered herein ("Consolidated Actions").

According to plaintiff, the relevant acts of illegal discrimination and retaliation started in 2002 (see Watson III

---

[3]Plaintiff filed her objections to my report and recommendation on August 28, 2013 (Docket Item 31 in 11 Civ. 9527).

Amended Complaint ¶ 3).  Although plaintiff alleges illegal discrimination, at her deposition, she has consistently maintained that she has been treated unfairly because her superiors have conspired with outside attorneys and unidentified third-party "operatives" who are out to retaliate against her as a result of her efforts to bring to light the illegal activities of the attorneys.  Specifically, plaintiff claims that the conspiracy resulted from her attempts to expose the fraudulent conduct of two attorneys, one of whom represented her in 1993 in connection with an automobile accident (Consol. Actions Dep. at 59).  According to plaintiff, after her personal injury action was concluded, the attorney who represented her in that action, Alan S. Ripka, along with another attorney named Seth R. Rotter, "used [plaintiff's] name and medical records to sue Waldbaums and Wyckoff Supermarkets fraudulently in a personal injury case that developed from an actual car accident that occurred while [plaintiff] was a passenger" (Consol. Actions Dep. at 65).  Plaintiff claims that Ripka "used [plaintiff's] name fraudulently to receive a million dollars off the books [and] used [plaintiff's] medical records, [her] name and sued [the] two supermarkets . . ." (Consol. Actions Dep. at 65).  Plaintiff claims that she discovered the alleged fraud when she reviewed certain unidentified court records while serving as a juror in New York State

Supreme Court, Kings County, sometime in 1995, 1996 or 1997 (see Consol. Actions Dep. at 65-66, 70, 75).  Plaintiff further claims that she reported Ripka and Rotter's allegedly fraudulent conduct and their failure to pay taxes on their allegedly ill-gotten gain to the IRS, and the IRS retaliated against her for reporting the crime (Consol. Actions Dep. at 73).  According to plaintiff, after she reported the conduct to the IRS, suspicious vehicles began to park outside her house and workplace, and unknown individuals began to follow her (see Consol. Actions Dep. at 75-78).  Plaintiff believes that she continues to be followed (Consol. Actions Dep. at 79).

Specifically, plaintiff claims that in addition to their own efforts to intimidate her, the lawyers have bribed a number of IRS employees so that they will not investigate Ripka's wrongdoing and will join in the program to intimidate plaintiff[4] (see Consol. Actions Dep. at 85-86, 90-92, 161, 364-67); she further claims that these activities have continued up to the date of the events giving rise to this action.  The conspirators allegedly paid off plaintiff's superior -- Ann Jones-Moffatte --

---

[4]In addition to "buying off" certain employees of the IRS, plaintiff believes that the third-party operatives are bribing employees of the U.S. Postal Service, certain family members, her dentist, her medical doctor and certain neighbors to join in the conspiracy against her (see Consol. Actions Dep. at 80, 84, 85, 180).

by buying cars for Jones-Moffatte and her daughter, giving cash to her family members and helping her son get into college -- all in an effort to persuade Jones-Moffatte to participate in the conspiracy to intimidate plaintiff (<u>see</u> Consol. Actions Dep. at 100-04).  Among other things, plaintiff believes the conspirators have broken into her home and stolen clothing and kitchen supplies, filled a bathtub above her apartment with cement, tampered with her mail, tried to run her over and dug a hole in plaintiff's backyard, into which she has fallen (<u>see</u> Consol. Actions Dep. at 106-07, 182, 285).  Plaintiff also believes that the conspirators have bribed Judge Marrero and myself to issue decisions adverse to her (<u>see</u> Consol. Actions Dep. at 111-12).

Plaintiff has repeatedly testified that the participation of her superiors in the alleged conspiracy is the <u>sole</u> motivating factor for the allegedly adverse actions she claims to have suffered in these Consolidated Actions.  For example, plaintiff testified as follows:

> Q.   And that's not just for one of your complaints, but you mean for all three of the complaints that are consolidated in this action, Ann Jones-Moffatte, you allege, is responsible for the adverse actions that were taken against you?
>
> A.   Yes.
>
> Q.   We discussed your theory as to why Ann Jones-Moffatte and others are taking these adverse actions against you, correct?

A.    Yes.

Q.    And to summarize -- and correct me if I'm wrong --
      it's because outside operatives are paying them
      monies or giving them other benefits to take ad-
      verse actions against you?

A.    Yes.

                    *      *      *

Q.    And your allegation is that those attorneys at-
      tempted to use your personal information to initi-
      ate another lawsuit unrelated to you?

A.    Yes.  That was Alan S. Ripka and Seth R. Rotter.

Q.    Then you reported that use of your personal infor-
      mation to the IRS?

A.    Yes.

Q.    And after that, these two attorneys started paying
      off people at the IRS, apparently paying them not
      to respond to the allegations you made?

A.    I believe that, yes.

Q.    And your theory is that in return for the payments
      they were receiving, folks at the IRS were receiv-
      ing, they started doing these bad things to you?

A.    Yes.

Q.    As you sit here today, are you aware of other
      reasons, unrelated to these payoffs, why people at
      the IRS have taken these adverse actions against
      you?

A.    That's the only reason.  Because I was in the IRS
      prior to my being sabotaged and harassed approxi-
      mately 14 years, and I didn't have that problem.
      It all began whenever I submitted documentation to
      TIGTA -- well, they were called "Inspection" then,
      and that's when the problems began.  I was fol-

                         8

lowed, my home was broken into on more than one
occasion, items were stolen, items were left.

       \*    \*    \*

Q.  Let me ask you one more time.  When it comes to
Ann Jones-Moffatte, is there any other reason you
think she's taking adverse actions against you
other than the fact that she's being paid off?

A.  I don't believe that she would have taken any
adverse reactions against me other than she had an
incentive, and the incentive is money, amenities,
and she's benefitting.  And I've told her that to
her face on more than one occasion and she's never
denied it.

(Consol. Actions Dep. at 363-67 (emphasis added)).

      Plaintiff further testified that she has filed her

lawsuits to put an end to the alleged conspiracy:

Q.  Is that one of the things that you want to get out
of this case, is to make these conspirators leave
you alone?

A.  Yes.  <u>That's more important than anything else</u>.
That's why I said if that happens, I would drop
everything and I wouldn't even want monetary pay-
backs.

(Consol. Actions Dep. at 298) (emphasis added).

B.    The Bases for
      the Present Actions

The present actions arise out of the following allega-

tions.[5]  Plaintiff does not identify which alleged incidents she

believes were discriminatory and which were retaliatory.

(1) Throughout 2002, plaintiff's leave and earnings

statements were withheld by the IRS (Watson III Amended

Complaint ¶ 3).

(2) In January 2003, the IRS cancelled plaintiff's

government-issued credit card after another employee used it

to purchase office supplies without plaintiff's permission

(Watson III Amended Complaint ¶ 4).

(3) Also in 2003, Jones-Moffatte failed to provide

plaintiff with an executed version of a 2002 annual perfor-

mance appraisal (Watson III Amended Complaint ¶ 1).

(4) Plaintiff reported to the Treasury Inspector Gen-

eral for Tax Administration ("TIGTA") on March 24, 2003,

that "large square boxes" were appearing on her computer

---

[5]I do not address defendant's contention that the administra-
tive judges assigned to plaintiff's EEO cases were bribed by
the IRS and "outside operatives" to dismiss her claims (Watson
III Amended Complaint ¶¶ 16-17).  The Honorable Loretta A.
Preska, United States District Judge, previously dismissed this
contention in an Order dated May 12, 2010 on the basis of the
doctrine of judicial immunity (Docket Item 3 in 10 Civ. 3948).

screen, indicating to plaintiff that someone had tampered with the computer (<u>Watson III</u> Amended Complaint ¶ 2).

(5) In April 2003, plaintiff discovered that her employee personnel folder was missing and TIGTA refused to investigate the incident (<u>Watson III</u> Amended Complaint ¶ 5).

(6) Plaintiff discovered in 2003 that her insurance policy had been cancelled by the IRS (<u>Watson III</u> Amended Complaint ¶ 15).

(7) In 2003 or 2004, plaintiff was informed that she would be reassigned to a different location (<u>Watson III</u> Amended Complaint ¶ 6).

(8) From 2003 to 2004, the IRS withheld plaintiff's annual performance appraisal checks from her (<u>Watson III</u> Amended Complaint ¶ 16).

(9) In June 2004, plaintiff failed to receive a refund check in the amount of $52.11 from the IRS (<u>Watson III</u> Amended Complaint ¶ 7).

(10) Plaintiff received approval for an order of office supplies that was later reduced by the IRS in June 2004, and the task of ordering supplies using an automated tracking system was re-assigned to a Caucasian employee (<u>Watson III</u> Amended Complaint ¶¶ 8-11).

(11) In December 2004, Jones-Moffatte withheld plaintiff's official personnel folder from her (<u>Watson III</u> Amended Complaint ¶ 12).

(12) Also in December 2004, plaintiff requested a copy of her 2000 tax return from the IRS and the IRS failed to provide it (<u>Watson III</u> Amended Complaint ¶ 13).

(13) In June 2005, the IRS delayed sending plaintiff an award settlement check in the amount of $81.75 (<u>Watson III</u> Amended Complaint ¶ 14).

(14) Sometime in 2006, Jones-Moffatte assigned additional tasks to plaintiff that plaintiff believed fell outside the scope of her expected work duties (<u>see</u> Consol. Actions Dep. at 148).

(15) Plaintiff did not receive an annual performance appraisal until June 2007, which was approximately six months late (<u>Watson II</u> Complaint ¶ E).

(16) In April 2007, plaintiff discovered that supplies were missing from her cabinet; she confronted Jones-Moffatte about this, and Jones-Moffatte retaliated against plaintiff by falsely accusing plaintiff of hoarding taxpayer documents in her file cabinet (Consol. Actions Dep. at 131-32; <u>Watson II</u> Complaint ¶ E).

(17) Plaintiff requested that TIGTA file criminal charges against Jones-Moffatte in 2008 for falsely accusing plaintiff of keeping taxpayer documents in her cabinet, and TIGTA refused to do so (Watson II Complaint ¶ E).

(18) Plaintiff was unfairly reprimanded for failing to record her work time in 2008 (Dep't of Treas. Final Agency Decision (TD No. IRS-08-0381-F) ("Treas. Decision"), dated Feb. 10, 2009, at 6-7, annexed to the Watson II Complaint).

(19) In 2009, the IRS informed plaintiff that her printer in her workstation would be removed, which caused her blood pressure to rise (Watson IV Complaint ¶ E).

III.  Analysis

A.  Summary Judgment Standards

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  To grant the motion, the court must determine that there is no genuine issue of material fact to be tried.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine

13

factual issue derives from the "evidence [being] such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), or by a factual argument based on "conjecture or surmise," Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The Supreme Court teaches that "all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); see also Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). It is a settled rule that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006); accord Hill v. Curcione, 657 F.3d 116, 124 (2d Cir. 2011); Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005); Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).

"Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Coppola v. Bear Stearns & Co., Inc., 499 F.3d 144, 148 (2d Cir. 2007), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir.

2007).  "'[I]n ruling on a motion for summary judgment, a judge
must ask himself not whether he thinks the evidence unmistakably
favors one side or the other but whether a fair-minded jury could
return a verdict for the [non-movant] on the evidence pre-
sented[.]'"  Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778,
788 (2d Cir. 2007), quoting Readco, Inc. v. Marine Midland Bank,
81 F.3d 295, 298 (2d Cir. 1996).

        Summary judgment is "ordinarily inappropriate" in
employment discrimination cases where the employer's intent and
state of mind are in dispute.  Carlton v. Mystic Transp., Inc.,
202 F.3d 129, 134 (2d Cir. 2000); Cifarelli v. Vill. of Babylon,
93 F.3d 47, 54 (2d Cir. 1996); see Gallo v. Prudential Residen-
tial Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994);
Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d
100, 103 (2d Cir. 1989); Meiri v. Dacon, 759 F.2d 989, 998 (2d
Cir. 1985).  Moreover, in discrimination cases,

>        summary judgment may not be granted simply because the
>        court believes that the plaintiff will be unable to
>        meet his or her burden of persuasion at trial . . . .
>        There must either be a lack of evidence in support of
>        the plaintiff's position, . . . or the evidence must be
>        so overwhelmingly tilted in one direction that any
>        contrary finding would constitute clear error.

Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998)
(footnote and citations omitted).  See Risco v. McHugh, 868 F.
Supp. 2d 75, 98 (S.D.N.Y. 2012) (Ramos, D.J.).

When deciding whether summary judgment should be
granted in a discrimination case, we must take addi-
tional considerations into account. <u>Gallo v. Pruden-
tial Residential Services</u>, 22 F.3d 1219, 1224 (2d Cir.
1994). "A trial court must be cautious about granting
summary judgment to an employer when, as here, its
intent is at issue." <u>Id</u>. "[A]ffidavits and deposi-
tions must be carefully scrutinized for circumstantial
proof which, if believed, would show discrimination."
<u>Id</u>. Summary judgment remains appropriate in discrimi-
nation cases, as "the salutary purposes of summary
judgment -- avoiding protracted, expensive and harass-
ing trials -- apply no less to discrimination cases
than to . . . other areas of litigation." <u>Weinstock</u>,
224 F.3d at 41 (internal quotation marks omitted); <u>see
also</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d
456, 466 (2d Cir. 2001) ("It is now beyond cavil that
summary judgment may be appropriate even in the
fact-intensive context of discrimination cases.").

<u>Desir v. City of New York</u>, 453 F. App'x 30, 33 (2d Cir. 2011)

(alteration in original).


B.   Application of the
     <u>Foregoing Principles</u>


Claims of discrimination on the basis of race, gender,

age and disability are properly analyzed under the now familiar

framework first set forth in <u>McDonnell Douglas Corp. v. Green</u>,

411 U.S. 792, 802 (1973). <u>E.g.</u>, <u>Men of Color Helping All Soc.,

Inc. v. City of Buffalo</u>, 12-3067-CV, 2013 WL 3285208 at *3 (2d

Cir. July 1, 2013) (race discrimination); <u>Ben-Levy v. Bloomberg,

L.P.,</u> 518 F. App'x 17, 18-19 (2d Cir. 2013) (age and disability

discrimination); <u>McMillan v. City of New York</u>, 711 F.3d 120, 125

(2d Cir. 2013) (disability discrimination); Bir v. Pfizer, Inc.,
510 F. App'x 29, 30 (2d Cir. 2013) (gender discrimination);
Rubinow v. Boehringer Ingelheim Pharms., Inc., 496 F. App'x 117,
118 (2d Cir. 2012) (age discrimination).

Under the McDonnell Douglas framework, plaintiff's
claims are assessed through a three-part, burden-shifting analy-
sis:

> [T]he initial burden rests with the plaintiff to estab-
> lish a prima facie case of discrimination.  "A plain-
> tiff's establishment of a prima facie case gives rise
> to a presumption of unlawful discrimination" that then
> "shifts the burden of production to the defendant, who
> must proffer a 'legitimate, nondiscriminatory reason'
> for the challenged employment action."  Woodman v.
> WWOR-TV, Inc., 411 F.3d [69, 76 (2d Cir. 2005),] quot-
> ing Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d
> 87, 91 (2d Cir. 2001)[].  If the defendant satisfies
> this burden, "the presumption of discrimination drops
> out" of the case, and the plaintiff must prove that a
> defendant's proffered reasons were not the true reasons
> for its actions but a pretext for discrimination.  Roge
> v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir.
> 2001).

Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005).

In order to meet her burden with respect to a prima
facie case of discrimination, plaintiff must offer evidence
sufficient to give rise to an issue of fact as to four elements:
(1) she is a member of a protected class; (2) she was qualified
for the position; (3) she was subjected to an adverse employment
action and (4) the adverse employment action occurred in circum-

17

stances giving rise to an inference of discrimination based on
her membership in a protected class.  Dawson v. Bumble & Bumble,
398 F.3d 211, 216 (2d Cir. 2005); Collins v. N.Y.C. Transit
Auth., 305 F.3d 113, 118 (2d Cir. 2002); Brennan v. Metro. Opera
Ass'n Inc., 192 F.3d 310, 316 (2d Cir. 1999); Norville v. Staten
Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); Hills v. City
of New York, 03 Civ. 4265 (WHP), 2005 WL 591130 at *3 (S.D.N.Y.
Mar. 15, 2005) (Pauley, D.J.); Beckmann v. Darden, 351 F. Supp.
2d 139, 146 (S.D.N.Y. 2004) (Robinson, D.J.); Williams v. Salva-
tion Army, 108 F. Supp. 2d 303, 308 (S.D.N.Y. 2000) (Berman,
D.J.), citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.
248, 252-53 (1981).

     A retaliation claim is subject to the same burden-
shifting analysis although the elements of a prima facie case are
slightly different.  Kaytor v. Electric Boat Corp., 609 F.3d 537,
552 (2d Cir. 2010); Jute v. Hamilton Sundstrand Corp., 420 F.3d
166, 173 (2d Cir. 2005).  To establish a prima facie case of
retaliation, a plaintiff must offer evidence sufficient to sup-
port a finding that:  (1) she engaged in protected activity; (2)
the employer was aware of this activity; (3) she suffered a
materially adverse employment action and (4) a causal connection
exists between the protected activity and the materially adverse
action, i.e., that a retaliatory motive played a part in the

18

adverse employment action. Obinabo v. Radioshack Corp., No.
12-2476, 2013 WL 2450544 at *1 (2d Cir. June 7, 2013); Rivera v.
Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 698 (2d Cir.
2012); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 177 (2d Cir.
2006); Constance v. Pepsi Bottling Co. of N.Y., 03-CV-5009
(CBA)(MDG), 2007 WL 2460688 at *34 (E.D.N.Y. Aug. 24, 2007). The
term "protected activity" refers to "action taken to protest or
oppose statutorily prohibited discrimination." Benn v. City of
New York, 482 F. App'x 637, 638 (2d Cir. 2012) (citation omit-
ted); see also Burlington N. & Santa Fe Ry. Co. v. White, 548
U.S. 53, 59 (2006) ("Title VII's antiretaliation provision
forbids employer actions that discriminate against an employee
(or job applicant) because he has opposed a practice that Title
VII forbids or has made a charge, testified, assisted, or partic-
ipated in a Title VII investigation, proceeding, or hearing."
(inner quotations and citations omitted)).

### 1.  Plaintiff's Discrimination Claims

Defendant does not take issue with plaintiff's ability
to meet the first two requirements of a prima facie case of
discrimination.[6]  See generally Gregory v. Daly, 243 F.3d 687,

---

[6]Although defendant does not take issue with plaintiff's
(continued...)

696 (2d Cir. 2001) ("To show 'qualification' . . . the plaintiff need not show perfect performance or even average performance. Instead, she need only make the minimal showing that <u>she possesses the basic skills necessary for performance of the job</u>.'" (inner quotations and citations omitted; emphasis in original)). Defendant does, however, contend that there is no evidence that plaintiff suffered adverse employment actions or that the purportedly adverse employment actions occurred under circumstances that give rise to an inference of discrimination. Defendant further argues that, even if plaintiff could establish a <u>prima facie</u> case of discrimination, plaintiff has not discharged her burden at the third step of the <u>McDonnell Douglas</u> analysis, namely she has not offered evidence sufficient to support a

---

[6](...continued)
ability to meet the first two elements of a <u>prima facie</u> case of discrimination, I note that plaintiff has not provided any evidence showing that she was "disabled" within the meaning of the American with Disabilities Act of 1990 ("ADA") in connection with her claim of disability discrimination.  <u>See</u> <u>Mastrolillo v. Connecticut</u>, 352 F. App'x 472, 474 (2d Cir. 2009); <u>Falso v. SPG Direct</u>, 353 F. App'x 662, 664 (2d Cir. 2009).  In any event, even assuming that plaintiff was "disabled" within the meaning of the statute, as discussed further below, plaintiff failed to establish a <u>prima facie</u> case of discrimination because she did not offer evidence that she suffered an adverse employment action on the basis of such disability.  <u>See</u> <u>Falso v. SPG Direct</u>, <u>supra</u>, 353 F. App'x at 664.

finding that the non-discriminatory reasons proffered by defendant are really pretexts for illegal discrimination.

>    a.  Plaintiff's Own Testimony
>        Does Not Claim Illegal
>        Discriminatory Animus

Plaintiff has offered no admissible evidence suggesting that the putatively adverse employment actions occurred under circumstances that would support an inference of discrimination and her own testimony abandons any claim of illegal discrimination.

Although there can be no doubt that workplace discrimination is often subtle and that individuals who engage in discrimination rarely expressly state their illegal motivation, a plaintiff alleging illegal discrimination must, nevertheless, offer more than a subjective belief that she has been the victim of illegal discrimination.  A plaintiff's "belief, based on no evidence other than gut instinct that [her supervisor] treated her with hostility because of her race, [gender, age or disability] cannot justifiably support an inference of discrimination when nothing in the record remotely links [the supervisor's] treatment of [plaintiff] to her race[, gender, age or disability]."  Taylor v. Records, 94 Civ. 7689 (CSH), 1999 WL 124456 at *16 (S.D.N.Y. Mar. 8, 1999) (Haight, D.J.) (emphasis in origi-

21

nal); <u>accord</u> <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991)
(summary judgment motion cannot be defeated "on the basis of
conjecture or surmise"); <u>Lioi v. N.Y.C. Dep't of Health & Mental</u>
<u>Hygiene</u>, 914 F. Supp. 2d 567, 583 (S.D.N.Y. 2012) (Engelmayer,
D.J.) ("[A] plaintiff cannot establish a <u>prima</u> <u>facie</u> case based
on 'purely conclusory allegations of discrimination, absent any
concrete particulars.'" (citation omitted)); <u>Shabat v. Blue Cross</u>
<u>Blue Shield</u>, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ("'It is more
than well-settled that an employee's subjective belief that he
suffered an adverse employment action as a result of discrimina-
tion, without more, is not enough to survive a summary judgment
motion, in the face of proof showing an adequate
non-discriminatory reason.'" (citation omitted)).

To the extent plaintiff testified that defendant acted
for discriminatory reasons on the basis of plaintiff's race,
gender, age and disability (<u>see</u> Consol. Actions Dep. at 464-93),
her testimony was entirely conclusory, subjective and unsupported
by any evidence of facts that could support an inference of
discrimination.  Moreover, by plaintiff's own admission, defen-
dant and his agents carried out the purportedly adverse actions
against plaintiff <u>solely</u> to receive benefits from third-party
operatives who are purportedly conspiring against her for her
efforts to disclose criminal activities (<u>see</u> Consol. Actions Dep.

at 363-67).  Plaintiff expressly testified that, but for the
monetary incentives, defendant and his agents would not have
committed any of the adverse acts (see Consol. Actions Dep. at
367).  Plaintiff testified repeatedly that the alleged bribes
were defendant's "only reason" for committing the allegedly
adverse acts (see, e.g., Consol. Actions Dep. at 101-02, 365,
367, 370).  That assertion by plaintiff herself, is fatal to her
discrimination claim.[7]

     The only arguably admissible evidence in the record
that might support an inference of discrimination is plaintiff's
testimony that she was treated less favorably than two other
individuals because of her race (see Consol. Actions Dep. at 465-
74).

---

[7]In plaintiff's amended complaint in Watson III, plaintiff
makes the conclusory statement that her employer discriminated
against her on the basis of her race, gender, age and disability
(Watson III Amended Complaint at 1).  In addition to being
entirely conclusory, these statements contradict plaintiff's
aforementioned sworn deposition testimony.  They are, therefore,
insufficient to create a genuine issue of fact.  In re Fosamax
Prods. Liab. Litig., 707 F.3d 189, 193 (2d Cir. 2013) (The "sham
issue of fact" doctrine "prohibits a party from defeating summary
judgment simply by submitting an affidavit that contradicts the
party's previous sworn testimony." (citation omitted)); Mack v.
United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well
settled in this circuit that a party's affidavit which
contradicts his own prior deposition testimony should be
disregarded on a motion for summary judgment." (citations
omitted)).

A showing of disparate treatment -- that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' -- is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003).  An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Id.  In other words, the comparator must be similarly situated to the plaintiff "in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).

Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010); accord Zuk v. Onondaga Cnty., 471 F. App'x 70, 71 (2d Cir. 2012).

The plaintiff bears the burden of demonstrating that a putative comparator is similarly situated in all material respects.  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." (citation omitted)); accord Bennett v. Verizon Wireless, 04-CV-6314 (CJS), 2008 WL 216073 at *2 (W.D.N.Y. Jan. 24, 2008); White v. Home Depot Inc., 04-CV-401, 2008 WL 189865 at *6 (E.D.N.Y. Jan. 17,

2008); Augustin v. Yale Club, 03 Civ. 1924 (KMK), 2006 WL 2690289
at *25 (S.D.N.Y. Sept. 15, 2006) (Karas, D.J.); Conway v. Micro-
soft Corp., 414 F. Supp. 2d 450, 459 (S.D.N.Y. 2006) (Holwell,
D.J.).  Whether employees are similarly situated is ordinarily a
question of fact; however, "if there are many distinguishing
factors between plaintiff and the comparators, the court may
conclude as a matter of law that they are not similarly situ-
ated." Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 312
(E.D.N.Y. 2012), citing McGuinness v. Lincoln Hall, 263 F.3d 49,
54 (2d Cir. 2001) and Harlen Assocs. v. Inc. Vill. of Mineola,
273 F.3d 494, 499 n.2 (2d Cir. 2001).

        Plaintiff testified concerning two putative Caucasian
comparators:  Gail Sussman and Bernard Klinosky (see Consol.
Actions Dep. at 465-74).  Both comparators, however, were em-
ployed by the IRS as Individual Taxpayer Advisory Specialists
("ITAS"), whereas, at all relevant times, plaintiff was employed
as a secretary (see Consol. Actions Dep. at 470).  While plain-
tiff testified that she had assumed some of Klinosky's clerical
duties after he retired, she also testified that an ITAS is
mainly responsible for preparing taxes and resolving tax issues,
while a secretary's principal duties are answering calls, typing
forms and reserving rooms (Consol. Actions Dep. at 471).  Fur-
ther, there is no evidence that Sussman or Klinosky engaged in

conduct similar to the conduct cited by defendant as having led to some of the allegedly adverse actions, i.e., disobeying the directions of a supervisor, failing to cooperate with the employer's procedures, etc.  Given these differences, Sussman and Klinosky were not similarly situated to plaintiff, and, thus, even if they were treated differently than plaintiff, such differences cannot provide a basis for an inference of discrimination.

The record presents no admissible evidence from which a reasonable jury could infer that any of the allegedly adverse employment actions occurred under circumstances giving rise to an inference of discrimination on the basis of race, gender, age or disability.  Accordingly, there is insufficient evidence to generate an issue of fact with respect to an essential element of a prima facie case, and defendant's motion for summary judgment is granted as to the claim of discrimination.

        b.   Legitimate,
            Non-Discriminatory Reason

Even if plaintiff had discharged her burden of establishing a prima facie case of discrimination, defendant would still be entitled to summary judgment on plaintiff's discrimination claims because plaintiff has not discharged her burden of

26

offering evidence sufficient to support a finding that the non-discriminatory reasons proffered by defendant are really a pretext for illegal discrimination.

As set forth in the annexed Appendix, defendant has either proffered legitimate, non-discriminatory reasons for the purportedly adverse employment actions cited by plaintiff or explained how plaintiff's own evidence belies her claim of discrimination.  Defendant attributes some of plaintiff's complaints to plaintiff's own failures to comply with her supervisor's orders and plaintiff's issues with her mail delivery. Plaintiff does not dispute that she refused to comply with certain procedures and that she frequently had issues receiving mail.[8]  Additionally, defendant provided numerous declarations, which set forth legitimate, non-discriminatory reasons for the remaining allegedly adverse actions.  These explanations are "clear and specific," Meiri v. Dacon, supra, 759 F.2d at 997, and are summarized in the Appendix, annexed hereto.

_____

[8]Plaintiff testified several times regarding her issues with the post office near her home.  She believes that the post office has been compromised by conspirators, and that the third-party operatives tamper with and withhold her mail (see Consol. Actions Dep. at 180).  Plaintiff even requested that defendant deliver paychecks to her using an overnight express courier, bi-weekly, in order to place her mail beyond the reach of the conspirators (see Pl.'s Aff., Ex. SJ-100).

Although a "'court must[, at the pretext stage,]
resolve all ambiguities and draw all reasonable inferences in
favor of the party against whom summary judgment is sought, with
the burden on the moving party to demonstrate the absence of any
material issue genuinely in dispute,'" Meiri v. Dacon, supra,
759 F.2d at 997 (citation omitted), at the third step of the
McDonnell Douglas analysis, there must be sufficient evidence in
the record to create an issue of fact as to the existence of
discriminatory animus.  The defendant has met his burden at the
second step of the analysis by supporting his motion for summary
judgment with plaintiff's own deposition testimony and numerous
declarations, which set forth undisputed examples of plaintiff's
inappropriate behavior, and which establish legitimate, non-
discriminatory reasons for the allegedly adverse actions.  Hence,
defendant's proffered reasons are more than sufficient to satisfy
his burden at this stage.  See McDonnell Douglas Corp. v. Green,
supra, 411 U.S. at 802-03.

Plaintiff has failed to offer evidence to show either
that defendant's stated reasons were in fact pretexts for illegal
discrimination or that discriminatory reasons more likely moti-
vated the defendant.  Here, "[t]he fact that the defendant did
not merely articulate -- but substantially established -- legiti-
mate, nondiscriminatory reasons for [the purportedly adverse

actions] rendered more difficult [plaintiff's] task of proving pretext." Meiri v. Dacon, supra, 759 F.2d at 997.  Yet, plaintiff's opposition brief is little more than a re-statement of her complaints in the Consolidated Actions, and consists of conclusory statements that lack evidentiary support (Docket Item 54). "[S]uch conclusory allegations of discrimination are insufficient to satisfy the requirements of Fed.R.Civ.P. 56(e)."  See Meiri v. Dacon, supra, 759 F.2d at 998 (citations omitted).

Further, plaintiff affirmatively stated at her deposition that the "only reason" her superiors committed the allegedly adverse actions against her was their receipt of monetary payments and other consideration from third-party "operatives" (Consol. Actions Dep. 365).  This admission is fatal to plaintiff's discrimination claim because it excludes illegal discriminatory animus from being a factor giving rise to any of the allegedly adverse employment actions.

Plaintiff has presented no admissible evidence from which a reasonable fact finder could infer that the neutral reasons proffered by defendant were pretexts for illegal discrimination.  Defendant is, therefore, also entitled to summary judgment with respect to plaintiff's discrimination claims on this ground.

29

2.   Retaliation Claim

With respect to plaintiff's claim of retaliation,
defendant contends that plaintiff cannot show that she was
subjected to any materially adverse employment actions and, even
if plaintiff could make such a showing, defendant argues that
plaintiff has not offered evidence to rebut his legitimate, non-
retaliatory reasons for those actions.

a.  Materially Adverse
Employment Action

"The antiretaliation provision protects an individual
not from all retaliation, but from retaliation that produces an
injury or harm."  Burlington N. & Santa Fe Ry Co. v. White,
supra, 548 U.S. at 67.  In assessing the level of harm that is
necessary to satisfy this element, the Supreme Court has in-
structed that "a plaintiff [asserting a retaliation claim] must
show that a reasonable employee would have found the challenged
action materially adverse, 'which in this context means it well
might have dissuaded a reasonable worker from making or support-
ing a charge of discrimination.'"  Burlington N. & Santa Fe Ry
Co. v. White, supra, 548 U.S. at 68 (citation omitted).  Hence,
"trivial harms," which include "petty slights, minor annoyances,
and simple lack of good manners," do not create an actionable

30

retaliation claim, whereas, significant harms do.  Burlington N.
& Santa Fe Ry Co. v. White, supra, 548 U.S. at 68 (citation
omitted).  Courts should be "mindful that material adversity is
to be determined objectively, based on the reactions of a reason-
able employee."  Rivera v. Rochester Genesee Reg'l Transp. Auth.,
supra, 702 F.3d at 698-99 (citation omitted; emphasis added).
However, "[c]ontext matters, as some actions may take on more or
less significance depending on the context."  Rivera v. Rochester
Genesee Reg'l Transp. Auth., supra, 702 F.3d at 699 (inner
quotations and citation omitted; alteration in original).

        The harms plaintiff alleges cannot qualify as materi-
ally adverse actions.  For example, although plaintiff alleges
she suffered as a result of being told that her workstation might
be relocated and her printer removed, plaintiff concedes that
these events never came to pass (see Consol. Actions Dep. at 237,
329).  These statements -- which never amounted to anything -- do
not rise to the level of injury required by a materially adverse
employment action.  See Tepperwien v. Entergy Nuclear Operations,
Inc., 663 F.3d 556, 571 (2d Cir. 2011) (empty verbal threats were
"trivial harms," and thus, were not materially adverse employment
actions); Delaney v. LaHood, 07-CV-471 (JG)(WDW), 2009 WL 3199687
at *19 (E.D.N.Y. Sept. 30, 2009) (listing cases in this Circuit
wherein "unrealized threats" did not meet the material adversity

requirement).  Likewise, plaintiff's allegations that her com-
puter temporarily malfunctioned or that the IRS's procedures
resulted in delays and misplaced folders are precisely the kinds
of "minor annoyances that often take place at work and that all
employees experience," and thus, do not constitute materially
adverse actions.  Burlington N. & Santa Fe Ry Co. v. White,
supra, 548 U.S. at 68 (citation omitted).  Similarly, plaintiff's
concession that "[her] job remained the same" (Consol. Actions
Dep. at 265), even though she could no longer utilize the IRS's
automated tracking system to purchase supplies or use a
government-issued credit card, demonstrates that her duties were
not sufficiently altered so as to constitute a materially adverse
employment action.  See Caban v. Richline Grp., 10 Civ. 559
(ALC), 2012 WL 2861377 at *13 (S.D.N.Y. July 10, 2012) (Carter,
D.J.) (Plaintiff's claim that defendant "gave her less work to
do" did not rise to the level of "significantly diminished
material responsibilities.").

        Similarly, plaintiff's allegations relating to disci-
plinary matters are insufficient to create an issue of fact as to
the existence of an adverse employment action.  Plaintiff alleges
that:  (1) in 2003, plaintiff's government-issued purchase card
was cancelled after she refused to complete an "unauthorized
procurement" document with respect to an unauthorized purchase

32

made on plaintiff's card by another employee; (2) in 2004, plaintiff's duties were amended after she refused to amend a supply order to reflect the correct price listings; (3) she received a letter of reprimand from Jones-Moffatte in 2007 for hoarding taxpayer files in a cabinet[9] and (4) in 2008, Jones-Moffatte noted in an Employee Performance Folder Record, also known as a Form 6067, that plaintiff failed to input her time for a week (see Treas. Decision at 6-7; Watson II Complaint ¶ E; Watson III Amended Complaint ¶¶ 4, 8, 9).

Plaintiff has failed to present any evidence establishing that these incidents produced an injury or harm that might have dissuaded a reasonable employee from engaging in a protected activity.  See Burlington N. & Santa Fe Ry Co. v. White, supra,

---

[9]Plaintiff further alleges in her complaint that she received a lower employee rating in 2008 as a result of this incident (Watson II Complaint ¶ E).  However, during her deposition, plaintiff testified that her performance rating was lowered "for some other reason," unrelated to the files found in her cabinet (Consol. Actions Dep. at 139-40).  In light of plaintiff's deposition testimony, I do not consider the allegation in the complaint that she received a lower performance rating as a result of this incident.  See AB ex rel. EF v. Rhinebeck Cent. Sch. Dist., 361 F. Supp. 2d 312, 316 (S.D.N.Y. 2005) (Robinson, D.J.) ("Faced with deposition testimony that contradicts an affidavit and a complaint, this court must accept [plaintiff's] sworn testimony.").  Moreover, even if the two events had been related, as discussed in further detail below, plaintiff has failed to present evidence that would permit a reasonable juror to infer that defendant's legitimate, non-retaliatory reason for the lower rating was pretextual.

548 U.S. at 68.  While there may be instances where a formal
letter of reprimand issued by an employer could constitute a
materially adverse employment action, see Millea v. Metro-N. R.R.
Co., 658 F.3d 154, 165 (2d Cir. 2011), if the context wherein the
employee is disciplined does not "reflect[] anything other than
[the employer's] enforce[ment] [of] its preexisting disciplinary
policies in a reasonable manner," then no reasonable juror could
conclude that the disciplinary actions "represented a departure
from [the employer's] disciplinary practices, such that they
might [] dissuade[] a reasonable worker from making or supporting
a charge of discrimination," Rivera v. Rochester Genesee Reg'l
Transp. Auth., supra, 702 F.3d at 699-700 (inner quotation marks
and citations omitted).

          As to the first incident, plaintiff admitted that she
refused to comply with her supervisor's directive to sign a
document concerning an unauthorized procurement (Consol. Actions
Dep. at 216).  Although the defendant did subsequently cancel her
government-issued credit card, the record, including plaintiff's
testimony, shows that he had a legitimate reason to, in light of
plaintiff's refusal to cooperate with certain procedures (see
Declaration of Christine Monroe, dated May 30, 2012 ("Monroe
Decl."), ¶ 18; Consol. Actions Dep. at 216).  Moreover, plaintiff
admitted during her deposition that she was not disciplined in

connection to this incident (Consol. Actions Dep. at 217).
Plaintiff also did not allege, nor does the record establish,
that any part of this incident represented a departure from
defendant's normal practices.  See Rivera v. Rochester Genesee
Reg'l Transp. Auth., supra, 702 F.3d at 699-700.

　　　　Likewise, as to the second and third incidents, the
record supports that defendant had good reasons for such disci-
pline, namely to account for mis-allocated funds and purchases,
and to ensure the proper maintenance of taxpayer files (see
Declaration of Almetya Brown, dated May 30, 2012 ("Brown Decl."),
¶¶ 7-14; Declaration of Ann Jones-Moffatte, dated May 31, 2012
("Jones-Moffatte Decl."), ¶¶ 75-83).  Here, too, the procedures
did not depart from defendant's normal course of business, such
that a reasonable employee might have found it to be materially
adverse.  Rivera v. Rochester Genesee Reg'l Transp. Auth., supra,
702 F.3d at 699-700.  Moreover, plaintiff admitted that she was
not disciplined in connection to the taxpayer files found in her
cabinet, and that the letter she had received from Jones-Moffatte
was merely a "warning" (Consol. Actions Dep. at 138-39).

　　　　The record also establishes that the fourth incident
was not a materially adverse action.  Defendant argues that a
Form 6067 is not a formal letter of reprimand.  Indeed, the form
is entitled "Employee Performance Folder Record" and contains an

evaluation section with options to record either positive or negative information about an employee (see Pl.'s Aff., Exs. SJ-60, SJ-62; Jones-Moffatte Decl. ¶ 96).  To the extent that a form with negative information was placed into plaintiff's folder, it establishes, at most, that plaintiff was criticized for her work performance, which is not a materially adverse employment action. See Tepperwien v. Entergy Nuclear Operations, Inc., supra, 663 F.3d at 570 (The "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action" for purposes of a retaliation claim.).  Plaintiff does not offer any evidence suggesting that she suffered a diminution in pay or duties, or lost an opportunity for a promotion as a result of the form.

In light of all the circumstances and evidence, including plaintiff's admissions, I conclude that no reasonable fact-finder could find that the disciplinary-related incidents plaintiff complained of would have dissuaded a reasonable employee from engaging in a protected activity.  See Tepperwien v. Entergy Nuclear Operations, Inc., supra, 663 F.3d at 568-70 (Three investigations into employee's conduct that occurred over eight months and for "good reason," and that did not result in disci-

plinary action, were not materially adverse employment actions, and, thus, could not support a claim of retaliation.).

Plaintiff also contends that her insurance was cancelled in retaliation for her EEO complaints (see Watson III Amended Complaint ¶ 15).  An "actual termination of health benefits and coverage can meet the Burlington Northern standard when such actions could induce an employee to refrain from participating in protected activity."  Delaney v. LaHood, supra, 2009 WL 3199687 at *20 (citation omitted).  Here, however, plaintiff has not adduced evidence sufficient to create a genuine issue of fact that her health insurance was actually cancelled.  Notwithstanding plaintiff's conclusory statements to the contrary, the record demonstrates that plaintiff enrolled in a new insurance plan in 2003, which resulted in the cancellation of her former plan (see Pl.'s Aff., Ex. SJ-87[10]).  In any event, plaintiff concedes that her former insurance plan was "restored" (Consol. Actions Dep. at 295), and the evidence shows that an employee from an IRS resource center attempted to assist plaintiff, left her voice

---

[10]Exhibit SJ-87 is an e-mail from Rosetta Watson to her employer, dated May 23, 2003, in which she states "[t]he matter of my GHI Plan being switched to GHI/HMO has to be corrected expeditiously . . . .  I need to know exactly when my old GHI Plan will be activated. . . .  I certify that I did not change my previous GHI Nationwide plan, but I do want it restored back to the GHI status that it was in before pay period 7."

mails, and informed her that her original insurance plan would be effective as of the putative cancellation date (see Pl.'s Aff., Ex. SJ-90). Even resolving all ambiguities in plaintiff's favor, the only rational inference that one could draw from these facts is that the cancellation resulted from an oversight, either by plaintiff or the defendant, that was subsequently corrected retroactively. Such an oversight, coupled with the eventual restoration of plaintiff's insurance, could not lead a reasonable employee to infer retaliation, and is, thus, not a materially adverse action. See Messer v. Bd. of Educ., 01-CV-6129 (JFB)(CLP), 2007 WL 136027 at *13 (E.D.N.Y. Jan. 16, 2007) ("[I]n the instant case, plaintiffs' COBRA health benefits were rein- stated shortly after they complained, retroactive to the benefit termination date. Because plaintiffs were not actually denied health care coverage during the relevant time period, they are unable to demonstrate that the first health benefit termination constituted a materially adverse employment action.").

Last, plaintiff's general complaints of her interper- sonal conflicts with Jones-Moffatte, her supervisor, appear to be no more than personality clashes, which are not actionable. See Burlington N. & Santa Fe Ry Co. v. White, supra, 548 U.S. at 68 ("[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable."

(inner quotations and citation omitted)); <u>Tepperwien v. Entergy Nuclear Operations, Inc.</u>, <u>supra</u>, 663 F.3d at 571.

Because I find that there is no evidence in the record from which a reasonable fact-finder could conclude that the challenged actions were materially adverse, I determine that plaintiff has failed to meet a required element of the retaliation claim. Defendant's motion for summary judgment, therefore, is granted as to the claim of retaliation as well.

> b.   Legitimate,
>      <u>Non-Retaliatory Reason</u>

Assuming for purposes of argument that plaintiff had discharged her burden of establishing a <u>prima facie</u> claim of retaliation, defendant would still be entitled to summary judgment on this claim because plaintiff has not offered evidence showing that the non-retaliatory reasons proffered by defendant are really pretexts for illegal retaliation.

As set forth in the Appendix, annexed hereto, defendant has articulated legitimate, non-retaliatory reasons for the purportedly adverse incidents alleged in the Consolidated Actions. For example, plaintiff alleges that her leave and earnings statements were withheld as retaliation for her EEO complaints (Consol. Actions Dep. at 206-07). Defendant explains

that the statements were delayed because plaintiff's earnings were subject to garnishment proceedings, and that fact prevented the IRS's automated payroll system from generating statements (see Declaration of Teresa A. Carter, dated May 30, 2012 ("Carter Decl."), ¶ 2; Pl.'s Aff., Exs. SJ-11, SJ-24, SJ-30).  Plaintiff's Exhibit SJ-30 shows that plaintiff continued to receive the same information, as she would have received on the statement, through a separate form, which was mailed to her by certified mail each pay period (Pl.'s Aff., Ex. SJ-30).  There is no evidence establishing that this legitimate explanation for the delays is a pretext.  Defendant also explained that the delays plaintiff complained about were not caused by defendant but by plaintiff's issues with her post office (see Consol. Actions Dep. at 302-04; Carter Decl. ¶ 18; Jones-Moffatte Decl. ¶ 57; Monroe Decl. ¶¶ 37-40).  Plaintiff herself conceded to these issues, and testified that she filed several complaints with the post office as a result (see Consol. Actions Dep. at 374-75).  Defendant's reasons suffice to satisfy his burden at this stage.  See McDonnell Douglas Corp. v. Green, supra, 411 U.S. at 802-03.

Except for her broad, conclusory statements, plaintiff has not responded to these neutral reasons (Docket Item 54), and the record does not contain any evidence impugning defendant's proffered reasons or suggesting the existence of retaliatory

animus.  Plaintiff has not demonstrated any temporal proximity between any of her EEO complaints and the allegedly adverse actions.  See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext . . . .  Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." (citations omitted)).  In addition, plaintiff conceded that, though several employees at the IRS were aware of her prior EEO filings, none had ever made comments to her about them, other than to acknowledge their awareness of the filings (Consol. Actions Dep. at 494); cf. Amin v. Akzo Nobel Chems., Inc., 282 F. App'x 958, 962 (2d Cir. 2008) (testimony that plaintiff was repeatedly instructed to stop making complaints about discrimina- tion in the workplace, among other things, sufficiently rebutted defendant's proffered non-retaliatory reason for discharging plaintiff).

Even plaintiff's subjective beliefs as to why defendant committed the putatively adverse actions are inconsistent. Despite plaintiff's conclusory remarks that defendant committed

the allegedly adverse acts to retaliate against her for filing
EEO complaints, plaintiff repeatedly and affirmatively testified
that Jones-Moffatte, who allegedly carried out the majority of
the purportedly adverse actions (Consol. Actions Dep. at 360-61),
was motivated <u>solely</u> by the bribes she was receiving from third-
party "operatives" (Consol. Actions Dep. at 363-67).  For exam-
ple, plaintiff stated during her deposition that she believed
Jones-Moffatte lied about finding taxpayer files in plaintiff's
cabinet because the conspirators bought her off (Consol. Actions
Dep. at 141-42).  Plaintiff also affirmatively testified that it
was the "operatives" who sought to discourage plaintiff from
filing EEO complaints because they did not want information
regarding their conspiracy to become public (<u>see</u> Consol. Actions
Dep. at 498-500).  This is clearly not the "causal connection"
that satisfies or is contemplated by Title VII, the ADA or the
Age Discrimination in Employment Act.

        Having failed to present any evidence of retaliatory
animus to rebut defendant's neutral reasons for his actions,
plaintiff's claim of retaliation cannot survive defendant's
motion for summary judgment.  See <u>Jackson v. N.Y.C. Transit</u>, 348
F. App'x 666, 669 (2d Cir. 2009) ("[Plaintiff] offered no evi-
dence that would permit a reasonable fact-finder to infer that
the [defendant's] stated reason was pretextual.  Accordingly, the

district court properly granted the defendants' summary judgment
on this claim.").

          3.  <u>Plaintiff's Remaining Claims</u>

          Plaintiff sets forth a laundry list of additional
grounds for relief.  The allegations include:  harassment, unfair
work employment practices, false accusation, stress, duress and
reprisal (<u>see</u> <u>Watson II</u> Complaint at 3; <u>Watson III</u> Amended
Complaint at 3; <u>Watson IV</u> Complaint at 3).  However, none of
these claims, if they even are claims, arise out of federal law,
and diversity of citizenship is not asserted.  Thus, assuming,
without deciding, that these other theories do state claims, I
dismiss them, as a matter of discretion.  28 U.S.C. § 1367(c)(3);
<u>see also</u> <u>Oneida Indian Nation of N.Y. v. Madison Cnty.</u>, 665 F.3d
408, 436-37 (2d Cir. 2011) ("[I]f a plaintiff's federal claims
are dismissed before trial, the state law claims should be
dismissed as well." (inner quotation marks and citations omit-
ted)).

IV.  <u>Conclusion</u>

          For all the foregoing reasons, I grant defendant's
motion for summary judgment and dismiss the complaints in the
Consolidated Actions in their entirety.  The Clerk of the Court

is directed to close (1) Docket Items 41 and 56 in 09 Civ. 6624;
(2) Docket Items 29 and 44 in 10 Civ. 3948 and (3) Docket Items
28 and 43 in 10 Civ. 7282, and to mark all three matters closed.

Dated:   New York, New York
         September 27, 2013

                                 SO ORDERED


                                 _____
                                 HENRY PITMAN
                                 United States Magistrate Judge

Copies mailed to:

Ms. Rosetta Watson
358 Fourth Street
Brooklyn, New York 11215

Copies transmitted to:

Sarah S. Normand, Esq.
Assistant United States Attorney
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

## APPENDIX

| Alleged Adverse<br>Employment Actions | Defendant's Response Or Deficiency<br>In Allegations Based On The Record |
|---|---|
| 1.  In 2002, the IRS withheld plaintiff's leave and earnings statements from her without explanation (Consol. Actions Dep. at 206-07; Watson III Amended Complaint ¶ 3). | Defendant was required to deduct and remit 10% of plaintiff's wages on behalf of a judgment creditor, pursuant to a notice of levy (Carter Decl. ¶¶ 2-3).  Plaintiff's checks were, therefore, processed manually.  The IRS system could not generate leave and earnings statements for employees who were paid manually.  Plaintiff received the same information through a separate form, as she would have received on the statement; these were mailed to her via certified mail each pay period (Pl.'s Aff., Ex. SJ-30).<br><br>Plaintiff's Ex. SJ-30 is a memorandum from the IRS to plaintiff, explaining the garnishment of her earnings.  When asked what evidence plaintiff possessed in support of her belief that the incident was retaliatory, she stated, "I didn't receive my leave and earning[s] statements . . . . That's all the evidence I need" (Consol. Actions Dep. at 209). |

## APPENDIX

2.  In January 2003, plaintiff's government-issued credit card was cancelled after another employee used it without plaintiff's authorization (<u>Watson III</u> Amended Complaint ¶¶ 4, 9; Consol. Actions Dep. at 213).

The credit card was cancelled because plaintiff had refused to sign an "unauthorized procurement document" and furnish a copy of a receipt; this information was necessary for the defendant to reconcile the unauthorized purchase (Monroe Decl. ¶ 18).  Plaintiff stopped ordering office supplies as a result of this incident, but continued to prepare the list that contained the order for office supplies; she concedes this was not a disciplinary action (<u>see</u> Consol. Actions Dep. at 217, 220).

3.  In 2003, Jones-Moffatte failed to provide plaintiff with an executed copy of an annual performance appraisal plaintiff requested for an application for an internal promotion; instead, Jones-Moffatte wrote the words "for promotion only" over the original signature line on the copy that was provided to plaintiff (<u>Watson III</u> Amended Complaint ¶ 1).

A first line manager, such as Jones-Moffatte, could sign an appraisal "for promotion only" and IRS personnel would accept it as valid without the need for another signature from a second level manager (Jones-Moffatte Decl. ¶ 17). Jones-Moffatte sought to obviate the need for a second signature when she provided plaintiff with a copy of the appraisal with the words "for promotion only" on it (Jones-Moffatte Decl. ¶ 17).

Plaintiff testified that third-party operatives provided Jones-Moffatte with bribes in exchange for sabotaging plaintiff's promotion application (Consol. Actions Dep. at 196-98).

2

## APPENDIX

4.  While filling out the same promotion application, plaintiff observed that "large square boxes" appeared on her computer screen, which was evidence to her that her computer had been deliberately tampered with (Watson III Amended Complaint ¶ 2).

The technical issues were "routine user assistance problems," and the IRS's technology services department quickly resolved them (Declaration of Rebecca Cummings, dated May 31, 2012, ¶ 4; see Jones-Moffatte Decl. ¶ 21).

Plaintiff testified that third-party operatives conspired with an IRS employee to tamper with her computer in order to sabotage her promotion application (Consol. Actions Dep. at 203; Watson III Amended Complaint ¶ 2).

5.  Plaintiff's employee personnel folder was stolen in April 2003 (see Watson III Amended Complaint ¶ 5).  Plaintiff reported the incident to the Treasury Inspector General for Tax Administration ("TIGTA"), but TIGTA refused to investigate the alleged theft (Watson III Amended Complaint ¶ 5).

The folder was ordinarily kept in Jones-Moffatte's office in a cabinet (Consol. Actions Dep. at 233). Plaintiff discovered that her folder was not in the cabinet in April 2003, which led her to conclude that it had been stolen (Consol. Actions Dep. at 233). Plaintiff believes that Jones-Moffatte stole the folder, and that she stole the folder because the conspirators paid her to do so (Consol. Actions Dep. at 229-30).

TIGTA informed plaintiff that duplicates of the documents contained in the missing folder were available from other sources (see Declaration of Robert Breunig, dated May 31, 2012, ¶ 5; Pl.'s Aff., Ex. SJ-14).

Plaintiff eventually found the documents she believed had been stolen (Jones-Moffatte Decl. ¶ 29; Consol. Actions Dep. at 226).

3

## APPENDIX

6.  The IRS cancelled plaintiff's GHI insurance policy for approximately one year in 2003 (<u>Watson III</u> Amended Complaint ¶ 15).

Plaintiff's Ex. SJ-87 suggests that plaintiff enrolled into a different insurance plan in 2003, which resulted in the cancellation of the former plan.  Plaintiff's Ex. SJ-90 shows that an employee from an IRS resource center attempted to assist plaintiff, left her voice mails, and informed her that her original insurance would be restored retroactive to the alleged cancellation date (Pl.'s Aff., Ex. SJ-90; <u>see</u> Consol. Actions Dep. at 295 (plaintiff conceding her insurance was eventually restored)).

Plaintiff believes that this event is another example of the conspiracy that third-party operatives are orchestrating against her (<u>see</u> Consol. Actions Dep. at 297-98, 374).

7.  In 2003 or 2004, an IRS employee informed plaintiff that she would be relocated, and if she did not, that she would "be punished" (<u>Watson III</u> Amended Complaint ¶ 6).

Plaintiff does not offer any evidence that this statement occurred or that it occurred for discriminatory or retaliatory reasons.  Plaintiff admits she was not actually relocated (Consol. Actions Dep. at 237).

8.  Also in 2003 or 2004, the IRS failed to send performance appraisal checks to plaintiff in a timely fashion (<u>Watson III</u> Amended Complaint ¶ 16; Consol. Actions Dep. at 302-04).

Plaintiff had opted out of direct deposit and requested that she be issued traditional paper checks (Monroe Decl. ¶¶ 37-40; Jones-Moffatte Decl. ¶ 57).  Plaintiff concedes that she did eventually receive the checks (Consol. Actions Dep. at 305).

4

**APPENDIX**

9.  In 2004, the City of New York sent a refund check in the amount of $52.11 to the IRS in plaintiff's name for an overpayment from her garnished earnings (<u>Watson III</u> Amended Complaint ¶ 7).  Plaintiff still has not received this check (<u>Watson III</u> Amended Complaint ¶ 7).

Defendant attempted to mail the refund check to plaintiff's home address on two separate occasions and, each time, the check was returned as "unclaimed" (Carter Decl. ¶ 14).  Defendant then attempted to personally deliver the check to plaintiff (Declaration of Richard L. Rodriguez, dated May 31, 2012 ("Rodriguez Decl."), ¶ 10), but plaintiff refused to accept it (Consol. Actions Dep. at 243).  It was plaintiff's belief that checks had to be dated within ten days in order to be cashed; thus, she refused to accept what she believed was an "expired" check (Consol. Actions Dep. at 243).

Defendant then contacted the marshal's office and requested that it re-issue a check and mail it directly to plaintiff's home (Carter Decl. ¶ 17; Consol. Actions Dep. at 243).  The marshal's office has not responded to the request (Carter Decl. ¶ 18; Consol. Actions Dep. at 243-44).

5

**APPENDIX**

10.  In June 2004, plaintiff received approval for an order of office supplies in the amount of $691.17, which was subsequently reduced to $246.22 "for whatever reason" (Consol. Actions Dep. at 249-50; see Watson III Amended Complaint ¶ 8).  Plaintiff was asked to amend the order downward, which she refused to do (Consol. Actions Dep. at 250, 252).  The task of ordering supplies using an automated tracking system ("RTS") was subsequently re-assigned to a caucasian employee (Watson III Amended Complaint ¶ 10; Rodriguez Decl. ¶ 6; Monroe Decl. ¶ 30).

The order was reduced because an employee learned that the prices quoted by plaintiff on the initial order request form were incorrect and higher than the actual prices of the requested supplies (Brown Decl. ¶ 7).  Plaintiff was asked to "amend the requisition downward" to match the correct price listing (Brown Decl. ¶ 11).

Defendant transferred plaintiff's RTS duties to a different employee due to plaintiff's lack of cooperation (Monroe Decl. ¶ 30).

Plaintiff conceded that, other than her inability to use the RTS, her job duties remained the same, i.e., she continued to create the supply requests and receive the supplies as they came in (Consol. Actions Dep. at 265).

## APPENDIX

11.  In December 2004, plaintiff requested to see her official personnel folder, as she did every year, in order to verify that its contents were accurate (Consol. Actions Dep. at 275-76). Jones-Moffatte deliberately withheld her folder from her for two weeks (Watson III Amended Complaint ¶ 12; Consol. Actions Dep. at 277).

The delay resulted from oversight and was not a deliberate act (see Jones-Moffatte Decl. ¶ 45). Plaintiff testified that she reached her conclusion after observing a Fed-Ex envelope sitting on Jones-Moffatte's desk for two weeks before receiving the same envelope, which contained her personnel folder (Consol. Actions Dep. at 277-78).

Plaintiff did not actually need her personnel folder during the two weeks (Consol. Actions Dep. at 280) and does not claim any identifiable adverse consequence as a result of the delay.

12.  In approximately late 2004, plaintiff requested a copy of her 2000 tax return (Watson III Amended Complaint ¶ 13; Consol. Actions Dep. at 283). Plaintiff's own copy had been stolen from her home by operatives who are conspiring with the IRS (Consol. Actions Dep. at 284-85). The Taxpayer Advocate Office's inability to retrieve her document was deliberate (Consol. Actions Dep. at 287).

The Taxpayer Advocate Office -- "an independent organization within the IRS that provides assistance to taxpayers" -- did provide plaintiff with her 2000 tax documents but was unable to furnish a copy of the W-2 because plaintiff had not attached that form when she filed her tax return (Jones-Moffatte Decl. ¶¶ 49-50). Plaintiff's Ex. SJ-18 shows that a transcript of the 2000 tax return was sent to her in 2004 (Pl.'s Aff, Ex. SJ-18).

Plaintiff believes the documents were withheld from her in furtherance of the conspiracy (Consol. Actions Dep. at 287-88).

## APPENDIX

13.  Plaintiff's union reached a settlement with the IRS in June 2005 in an unrelated matter (<u>Watson III</u> Amended Complaint ¶ 14). Plaintiff was owed a settlement check of $81.75; she did not receive it until October and the envelope had been tampered with (<u>Watson III</u> Amended Complaint ¶ 14).

The union, and not the IRS, was the party ultimately responsible for distributing the settlement check to plaintiff (Monroe Decl. ¶ 35).

Plaintiff testified that third-party operatives had "bought off" some unknown individual to deliberately delay her receipt of the check (Consol. Actions Dep. at 289).

14.  In 2006, Jones-Moffatte assigned plaintiff certain tasks that fell outside the scope of her expected work duties (Consol. Actions Dep. at 147-48; <u>Watson II</u> Complaint ¶ E).

The additional duties of preparing and filing tax forms were assigned to plaintiff after another employee left, and were consistent with plaintiff's position description; the IRS's position description of the secretarial position includes "preparing forms and filing" (Jones-Moffatte Decl. ¶¶ 60-64).

15.  Plaintiff received her 2006 annual performance appraisal approximately six months late (Consol. Actions Dep. at 102-03; <u>Watson II</u> Complaint ¶ E).

Both parties concede that plaintiff was out of the office from January to April 2007 (<u>Watson II</u> Complaint ¶ E), which was the cause for the delay (Jones-Moffatte Decl. ¶ 84).

8

## APPENDIX

16.  When plaintiff re-
turned to the office
after a prolonged leave
in 2007, she discovered
that some of her office
supplies were missing
(Consol. Actions Dep. at
131-32).  Plaintiff ap-
proached Jones-Moffatte
about this, and Jones-
Moffatte retaliated by
drafting a "phony" let-
ter of reprimand, false-
ly accusing plaintiff of
hoarding hundreds of
taxpayer documents in a
cabinet that she was
supposed to have filed
(Consol. Actions Dep. at
100-01, 143; Watson
II Complaint ¶ E).

In early 2008, Jones-
Moffatte lowered plain-
tiff's annual perfor-
mance rating on the ba-
sis of this false accu-
sation (Watson II Com-
plaint ¶ E).

In early 2007, Jones-Moffatte's
office had been cited by the IRS
for having failed to file certain
taxpayer forms, which fell within
plaintiff's responsibilities (see
Jones-Moffatte Decl. ¶ 75).
Jones-Moffatte then discovered, on
at least three separate occasions,
bundles of the same taxpayer forms
in plaintiff's filing cabinet;
these comprised 800 forms in total
(see Jones-Moffatte Decl. ¶¶ 76-
79).  In April 2007, Jones-
Moffatte issued a memorandum to
plaintiff, informing her that her
failure to file the forms was "to-
tally unacceptable" and reminding
her of the need to file the forms
(Jones-Moffatte Decl. ¶¶ 81, 82;
Pl.'s Aff., Ex. SJ-39).

Plaintiff concedes that she was
not disciplined and that the let-
ter was just a "warning" (Consol.
Actions Dep. at 139).  Plaintiff
testified that Jones-Moffatte com-
mitted these acts in exchange for
payments from third- party opera-
tives, and for no other reason
(Consol. Actions Dep. at 101-02).

9

**APPENDIX**

17. Plaintiff requested that TIGTA file criminal charges against Jones-Moffatte in March 2008 for falsely accusing plaintiff of keeping taxpayer documents in her cabinet, but TIGTA refused (<u>Watson II</u> Complaint ¶ E).

The TIGTA special agent explained to plaintiff that criminal charges could not be filed against Jones-Moffatte "because [plaintiff's] complaint dealt with personnel and labor relations issues" (Declaration of Grimaldi Alvarez, dated May 31, 2012, ¶¶ 5-9). When asked what injuries plaintiff incurred as a result of TIGTA's refusal, plaintiff testified that "it was frustrating" (Consol. Actions Dep. at 149).

18. In 2008, Jones Moffatte prepared an Employee Performance Folder Record, also known as a Form 6067, stating that plaintiff failed to record her hours worked (Treas. Decision at 6-7).

Jones-Moffatte's use of a Form 6067 was not a reprimand; rather, the form is used "to record both positive and negative information about an employee's performance" (Jones-Moffatte Decl. ¶ 96; <u>see</u> Treas. Decision at 6-7). In that particular instance, Jones-Moffatte issued plaintiff a Form 6067 for failing to record her time for a week, as Jones-Moffatte had done with at least five other employees (Jones-Moffatte Decl. ¶¶ 97, 98).

Plaintiff's exhibits show that her employee record contained two Form 6067's in 2008 -- one reflecting positive information, and the other, negative (Pl.'s Aff., Exs. SJ-60, SJ-62).

10

**APPENDIX**

19.  In 2009, plaintiff was informed that the printer in her workstation would be removed and that she would have to use a shared printer, which caused her blood pressure to rise (<u>Watson IV</u> Complaint ¶ E). Plaintiff believes Jones-Moffatte tried to move her printer because plaintiff was disabled (<u>see</u> Consol. Actions Dep. at 490).

Defendant intended to remove the printer because plaintiff did not need a stand alone printer, and plaintiff already had access to a network printer, which the other employees in Jones-Moffatte's group were already using (Jones-Moffatte Decl. ¶ 100).  Plaintiff testified that the majority of employees in her division used shared printers (Consol. Actions Dep. at 321).

Plaintiff concedes that the printer was not ever removed from her workstation (Consol. Actions Dep. at 329; Jones-Moffatte Decl. ¶ 11), and believes that Jones-Moffatte issued the threat in the first place because she was being "paid off" by third-party operatives to harass plaintiff (Consol. Actions Dep. at 344).

11